God save the United States and this honorable court. Good afternoon. As you all know, we're here this afternoon to hear one case. It's 22-50257 Gilchrist v. Schlumberger Technology Corporation. Mr. Lombardi. Thank you, Your Honor, and good afternoon, Your Honors, and may it please the Court. My name is Robert Lombardi, representing Schlumberger Technology Corporation, or STC. STC respectfully asks this court to reverse the district court and render judgment in favor of STC as the two plaintiffs in this case clearly fall under the FLSA's highly compensated employee exemption, or HCE, and are not entitled to overtime compensation. This is an FLSA case in which the Western District of Texas, in a bench trial, found that two measurement monitoring specialists, or MDs, met the salary and compensation requirements for the HCE and that their primary duty did not involve manual work. Still, the court found for plaintiffs, based upon its determination, that they did not regularly and customarily perform exempt duties because the type of work they performed was not directly related to the customer's general business operations as it was functional, not conceptual, and the work did not relate to the customer's general business operations as a whole. These are conclusions of law subject to day and over view, and they are loomis. The district court reached its conclusion by the application of strict law, by its case law, strictly construing the exemption against the employer, contrary to the Supreme Court's holding in Encino Motor Cars LLC versus Navarro. If the court had correctly applied the HCE in accordance with Encino Motor Cars, and this court's holdings in Zanicus versus Oil Inspections USA and Smith v. Ochsner, the court would have found that plaintiffs customarily and regularly perform at least one exempt duty or responsibility as they regularly perform quality control, legal compliance, and safety duties and served as advisors and consultants to the SGC's customers. Zanicus and Smith both demonstrate that an employee does not have to be involved in formulating a client policy that applies to the entire company or working in one of the specifically listed departments in section 541.201, such as accounting or tax. The regulations are clear as to those who are eligible for or excluded from the administrative prong of the HCE exemption. Section 541.201, the administrative prong of the HCE exemption, section 541.21a excludes those open quotes working on the manufacturing production line or selling products in service environments establishments, close quotes, but includes those who open quotes work is directly related to running or servicing the business, close quotes. The courts, including this court, have drawn a clear line regarding the difference. Employees who are one step back from the production line are eligible for the administrative or HCE exemption if they meet the exemption test. Circuit courts, including this court, have found the HCE applies to oil inspectors checking valves on barges to ensure volumes and proper mixtures, as in Zanicus. Transplant coordinators who support the transplant team by finding, arranging for, and actually transplanting organs, as in Smith. Maintenance planners who schedule maintenance and repair of nuclear power plants, as in the Seventh Circuit's Kennedy v. Commonwealth Edison decision. Pilots who fly corporate jets, as in the Ninth Circuit's Kennedy v. Las Vegas Sands Corporation decision. And also the Third Circuit determined that a manager who forwarded communications to the client was not a production employee but exempt under the HCE in Perez v. Express Scripts, Inc. Further, another panel from this court, in a published opinion concerning a related Schlumberger company, Venable v. Smith International, just held that reamers who worked at the customer's rates overseeing the use of Schlumberger tools and advising the customers are exempt under the HCE as, open quotes, their work was directly related to the general business operations of the customer and they acted as advisors and consultants. Venable precludes the district court's holding here that general business operations require conceptual rather than functional work and the work must be related to the whole business. In fact, all these cases stand for the precept that a position supporting operation potentially falls under the administrative and highly compensated exemption so long as it is one step back from the production line and meets the elements of the exemption test. In that same line, Venable precludes plaintiff's argument that advisors and consultants to customers are actually production employees because advice and consultation is the product that the employer sells. It is undisputed that here two plaintiffs analyzed and approved all the surveys and log data before sending the data to the customers and the directional drillers and if they saw any issues with the data, they either fixed it themselves or brought it to in the necessary resources such as experts from the operations support center to ensure the information that they were giving to the customer was accurate. They also regularly supervised, trained, and evaluated junior MWDs and trainees and supervised rig crew members in the Basically, any of those duties alone can be the one exempt due to your responsibility customarily and regularly performed that establishes plaintiff's exempt status and requires judgment in favor of STC and all these duties are in line with the cited cases that supporting and advising customers satisfies the HCE. Under the HCE, if STC establishes any of the above, which it has, STC does not need to also show that plaintiffs exercise independent judgment and discretion. This is made clear by both Xenakis and Smith and the court's factual findings clearly support the fact that they did support the general the customer's general business operations and plaintiffs also admitted that it filed. Further, the evidence clearly shows that plaintiffs exercise judgment and discretion. Plaintiffs own admissions on cross-examination are perfectly in line with job descriptions, operations manuals, and plaintiffs own resumes detailing the requirements for judgment and discretion. Mr. Lombardi, a couple of questions. Judge Jones here. Number one, the company did not have to show both administrative and independent judgment and discretion, correct? That is correct, ma'am. One of those would suffice. That would suffice. Our primary argument goes to the issue of supporting the general operations of the customer. That's a pure issue of law and does not require the court to make any factual findings. Well, and my question about what these fellows did is, if they made a mistake in how they read the downhole data that they were monitoring in the truck on the well site, what would happen to the well? Your honor, the well could end up drilling onto somebody else's tract of land, which would cause huge legal issues. It could run into another well, which could potentially cause a blowout, explosions, death. There would be serious consequences. And how much money would be incurred if they erred by even so much as, you know, four or five feet or the necessary geologic configuration underground? Your honor, the data that they were giving was provided in order for the drill bit, the bottom hole assembly from the drill string to hit the reservoir where it would produce. And those were measured basically to the feet in terms of where they were expected to go. Missing by five feet, ten feet could result in having to re-drill the well or portions of the well or perhaps having to start over from scratch. So it seemed to me, I thought that was the case, and it seemed to me that maybe the Hobbs case is against you, but in Hobbs the so-called field engineers were taking photos, right? Yes, your honor, they were taking photos and the total, what the court found, the total extent of their quality control function was dropping a coin into a bottle of water and see if they could see it on the bottom. The quality control functions here are much, much greater than that in terms of reviewing the data. Also, your honor, it's interesting that Hobbs quotes heavily from Dewan, and Dewan was actually overruled sub salientio by the Supreme Court's Encino Motor Cars decision, which was issued one year after Dewan and required that the court give a fair reading to exemptions, whereas Dewan strictly construed the exemption. Thank you. Yes, your honor, and before getting into the weeds of the MWD's duties, it's important to understand that STC provides expert support to customers drilling operations. STC employees bring skills that the drilling crew just doesn't have. STC's plaintiffs agree that the customer's general business operation was the drilling of wells to produce oil and gas. The rig crew is the production line in that scenario. This is not what the MWD's did. The MWD's did not operate any rig equipment. They were a step back from that in advising the customer as to how to produce the well. Again, from the big picture, STC typically deployed two directional drillers, or DDs, and two MWDs to support a customer's horizontal well drilling operation so that you would have one MD and one DD on the same shift. About 50% of the MWD's have engineering degrees. The rest have technical or oil field experience. It takes six to eight months of training before an MWD can hold their own shift. The MWD's primary function was analyzing and QCing data, eliminating bad data, and passing along the good data to the customers and DDs on a continuous basis. There are two major components to the data that the MWD was QCing and sending to the customer. The first is surveys, typically 50 to 100 surveys per week. The downhole sensor at the tip of the MWD is the measurement and inclination of the head of the drill spring. The computer then does a pre-screen of those surveys and colors them either red or green. The MWD then conducts his own review of the surveys and based upon the pre-screen by the computer and all the data the computer didn't consider, he makes his own determination whether to accept or reject the survey. He does this routinely without supervision. If he determines the survey is bad, he directs the rig crew to back up the drill spring and shoot another survey. The MWD also analyzes logging data on a continuous basis. This typically includes gamma radiation and resistivity logs. The amount of the gamma radiation emitted and the electrical resistivity of the geological formation provides a lot of information about the geological formation. This is compared against the customer's well. The customer, I mean the customer's model, the customer creates a model based upon other wells drilled in the area, but this is only an estimate. It is the MWD's data that confirms the model or tells the customer that they need to reform their drill plan. This is a crucial function for the MWDs and they have to QC and ensure that they are passing along accurate data or else, as Judge Jones was pointing out, the results can be catastrophic. The data serves two functions or rather the QCing is in two functions. The first one is the MWD is obviously QCing the data to make sure it's accurate and they have the ability to mask or eliminate the data they determine to be inaccurate. The second QCing function is the overall QC for the entire drilling operation. As I said, they are verifying the customer's model and also the surveys that are coming back tell whether or not the well is right, left, up, or down and that provides the information so that they can make adjustments and actually hit the pay zone rather than ending up in someone else's rack. They also play regulatory compliance roles. Both Mr. Gilchrist, well Mr. Gilchrist admitted that filling out survey reports and signing sworn statements to be submitted to the state of Texas for verifying the accuracy of the surveys and these became public records that were then used by other companies to determine whether or not wells they were planning to drill might collide with other wells. Mr. Brockman said he did the same thing in the state of Arkansas and that the reports were basically the same. They also perform a safety function. The rig crew supports the MWDs. They do the heavy lifting at the well. They install the sensors onto the drill spring. The MWDs supervise the MWDs in conducting this operation and they make sure that they are doing so in a manner that is safe both for the equipment and the personnel. The MWDs also have special training in such things as lithium batteries which are used by the sensors. Lithium batteries can catch fire, they can explode, and they will emit a dangerous gas if they do so. The rig crew is not trained how to respond that. The MWDs are and how to how to direct the rig crew and first responders given the presence of lithium batteries. Your honors, I could talk for another 10 minutes but I see I'm out of my time so if anybody has any questions I'd be happy to answer. Thank you counsel. Mr. Brazeal. Yes your honor, sorry to unmute there but good afternoon and may it please the court. I'm here representing the plaintiffs in this case concerning their entitlement to overtime for the very long hours that they worked out on rigs and I'll just start right off by talking about really kind of in the order that Mr. Lombardi did the different issues. Your honor, you asked a question about whether you had to to have the discretion and independent judgment component. For the highly compensated exemption, the answer there is no. For the standalone exemption, they do have to have that and I want to just clear that up a little bit. As to the highly compensated exemption, what the what the court did overall was look at the testimony, make credibility determinations on what was the nature of the work, and then decide whether or not factually if that rose to the level of being the kind of work that would be exempt work. So it's possible in these cases where you have similar employees but maybe one of them is not credible, one of them is credible on different sides of cases. So you could have a different outcome in some of these cases. It shouldn't be that way but those kinds of determinations are things that we typically leave for the fact finder. In this particular case, the judge, as Mr. Lombardi pointed out, both the nature of the work and the sort of extent of the work was determined to not be administrative and to not be, in terms of the frequency, not to be customarily and regularly something that they do in terms of, at least one of these we'll talk about in a second. The first one to talk about is the concept of the general business operations or management of the customer. So here there's really a distinction between a production line and producing the product that the company sells or the service that it provides and then and whether or not it's sort of a general thing, meaning like a marketing director directs marketing and that affects the business broadly. The folks who do all the computer engineering and that sort of thing, if they're designing those systems and things and putting them into place, those kinds of things. Here though, what Schlumberger sells to the driller, where the company man works for, is basically a hole drilled to a specific place. And the nature of the work is such that you can't drill it if you can't see it. And so what the MWDs do is they provide the eyes, or I guess the best analogy I came up with was the folks who flag the airplanes at the airport, where the pilot can't see and you're trying to direct that airplane out. That's essentially what they're doing. They're just doing it here with data. And so the data that comes out, they don't do an analysis of it. They do a review and see whether it's red or it's green and determine, did we get a good read? If there's a lot of red, we might not have gotten a good read. And there are protocols that the plaintiffs testified about it and so did the company witnesses, that they have to follow in certain kinds of situations. And so it's more of a skill, to the extent that it is, to see if something's red or green and determine what it is that might be causing that feedback or that sort of thing. Well, Mr. Brazeal, if it's just a production function in the sense that you're describing someone on the production line, then why do 50 percent of the fellows have engineering degrees? Seems to me their talent would be wasted. I think that it probably is, Your Honor. They don't use the engineering degree. You think Schlumberger hires licensed engineers if they could hire guys with, call it mere, you know, a BA in philosophy to do the same job at a lot lower price? Well, I would say that in West Texas these days where sometimes it's hard to find people, yeah, sometimes they will hire those folks. But they also hire, just like the plaintiffs here, they also hire people without those kinds of degrees. And if you could do the job... Yeah, I, you know, I read the briefs and I really, I understand, but I mean, you do your argument as you choose. It seems to me you'll have a difficult time overcoming the decision this court issued only a month ago or so or less in the Venable case where you have downhole experts who simply tell the offshore platform people how to run this, whatever an under reamer is, on the one hand, which seems strikingly like what MWDs are doing because they are basically telling, as you said, they're the eyes of the drilling rig. And if the drilling rig goes blind, you're going to screw up the whole well. So it seems to me the stakes are very high for the quality and type of work that the MWDs do. Your Honor, I understand your point. In this situation, however, they don't go out and advise what to do next. They get the data and make sure that it's accurate. And then they give it to the directional driller. That guy makes decisions. That guy is the one who decides what to do next. And he's the one that's going to drive the drill in the wrong direction. But we're not saying that the directional driller knows how to read all these outputs, are we? Absolutely. That's exactly what he does. But somebody has to be able to read them knowledgeably and correctly in order to give them to him, do they not? In this instance, all they have to do is see if they got a red or green and whether or not that came back as a valid or invalid. Was that an explicit finding of the district court that all they do is look at red and green? He did mention that, yes, Your Honor. He talked about that they had to determine whether or not there was an issue. What they do then if there's an issue is they figure out what the issue was and is this survey good, right? And, for example, echoing in the drilling can cause these red things to pop up. It's not necessarily a bad read and they have protocols for how they deal with it. And if they get stuck, they have to send it off to the operations center to ask those folks what to do. They don't make these decisions themselves. Well, let me go back to what I was saying. How do you distinguish this case from Venable? Just like that, Your Honor. They're not advising what to do. They're simply gathering the data just as if they saw the airplane and they're the ones, they're not even saying go this way, go this way. They're not even going to that level. They just get the information and give it to the directional driller. That's the person who drives everything and who makes those determinations. Sorry. No, pardon me. I just have a very quick question. Is your take that this case is sort of falls somewhere between Venable and say a case like Hobbs? Exactly right. Exactly right. Hobbs, I know that they were only getting video, right? But, in essence, the video had to be good, right? They're looking at the quality of whatever the video was because if you get something back that's blurry, the person that looks at it can't use it. Well, here, the survey, if it's a lot of red, it's blurry and they can't use it. But that individual, our guys, the MWDs, are the ones who just gather the data, collect it, and make sure that the readout is supposed to be what it is. What people do with it after that is up to them. And so I think that's very important. Why wouldn't a driller be able, if the driller can look at it and tell the same thing as these people do, why would you need these people at all? Why wouldn't the driller just look at the surveys and take it from there? It's the nature of how the computers are set up and what the driller is doing versus what the MWD is doing. He's collecting that data as the driller is drilling, right? And getting these surveys. And he also is the person who has to go take this pretty large piece of equipment and put it, rig it up so that it goes down the hole. The driller doesn't do that. He's doing other stuff. And so it's just a split off function. At this point, it's gotten to the point where they actually do a lot of it remotely in these operations centers because they've got internet and can do these things remotely. You don't need anybody out there other than just to drop it down the hole. And so the driller is the guy that could do it, but it's not his job, I guess I'd say. They split it off because otherwise you'd work them to death. These guys already work two jobs, basically, with what they're doing. I'd like to turn to something that Mr. Lombardi said about the standard of review. He indicated that he thought that the judge's determinations were questions of law. Oh, I'm sorry. Did we lose Judge Jones? Do I need to wait? No, I'm sorry. I was looking down. No, I've done that before too. Sorry. These were not determinations of law. These were questions of fact. He was, as Hobbes says, and as the Supreme Court case that Hobbes is relying on says, that when it comes to how much time is spent doing what particular tasks and what the nature of that work is, those are fact questions. Whether someone's exempt or not, which may be a foregone conclusion, right? Once your facts are a certain way, maybe a foregone conclusion, but the statement that they're exempt, that's the determination of law. Can I just interrupt that just a little bit? Sure. Because I was curious about the same thing when the Budget Council made that statement. Would it be fair to say that this is sort of both? I mean, is this a mixed question of law and fact, or do you really think this is purely a fact? Well, I think that the determinations that Mr. Lombardi was having issue with were questions of fact. I think that the case involves both questions of law and fact, just like the Dalheim case from many years ago involving the news reporters and things. You have to look at what's the nature of the work that they're doing, right? And what the court looked at here is he said, look, this is not the kind of thing that the administrative exemption has in it. These facts, the kind of work that these folks are doing, for example, just looking at the red or green and correcting things, or if he's collecting information for a report, but he's signing it and giving it to somebody else at Schlumberger, but not turning it in. If people are alongside him and watching what he's doing for the on-the-job training, those are not the kinds of things that an executive does. An executive is going to train. Let me try it a different way. Is the main fight between the two sides in this case issues of fact? In other words, are you debating what these people do, or is it pretty settled what they do, and it's really just a debate about the FLSA implications? Well, when I read the Hobbs decision and also then look back at the Supreme Court case that it was citing to, it talks about both the nature and the time. It says the how an employee spends his working time and inferences about the nature of an employee's work. And so the inference about the nature of the work, you know, I think I liken this at trial to this is like calling a janitor or sanitation engineer and speaking very high-minded and highbrow about what he does when, in essence, he's taking out the trash. He's also managing waste. He's got environmental impacts. He's coordinating when that happens and at what times it happens. He's making decisions. I mean, you can kind of bootstrap on to the lowest-level employee words like that. And that's what I think Judge Jacob was looking at, was really these guys aren't doing the kind of work we're talking about here. The nature of the work that they're doing just doesn't match up. And so when he makes the factual determinations and says this is what they're doing, then the conclusion that you draw from that, like I said, might be a foregone conclusion depending on how you come up with your facts. But in this case, he did a very good job of going through and saying this is the nature of that work. This is how much time they spend on it. Under customarily and regularly, it has to be something that they do every week, basically. And so when only 50% of someone's time is spent with people that tag along and see what's going on, that's not necessarily every week. And there was no evidence, as he indicated, that these folks were doing any kind of training every week. Well, let's not get off the ball here because they didn't really spend much time on that, at least in their rebuttal brief. And they focused on two points, whether this was quality control and whether it was work directly related to the management of general business operations. And at least in the latter regard, I think the court was wrong in relying on the Dewan opinion based on pre and Sino law for what management policies, general business operations, and policy determinations are. That seems to me like an error of law. So, Your Honor, I don't think he relied necessarily on Dewan's emphasis on a narrow reading. I think he relied on the DOL regulations that set those things out. Dewan, while it did have the narrow reading, Judge Akel looked at this and said, look, I'm doing this under a fair reading of the law. And under a fair reading, they still don't get there. Well, he says plaintiff's duties did not directly relate to the client's management policies, general business operations, or policy determinations. But it seems to me if you talk about the consequences of what they were doing, they were integral to the client's operations of drilling a well. So, Your Honor, in this particular instance, the framework that the Department of Labor lays out is it has to be the management of the company versus the sort of operations. No. What is the production? Quoting from the district court opinion, Schlumberger argues that plaintiffs performed work, quote, directly related to the management or general business operations of Schlumberger's customers, 29 CFR 541.201C. And that is plaintiffs, Schlumberger argues, plaintiffs acted as advisors or consultants to Schlumberger's client. And then it goes on to quote Dewan. But I don't see, again, from the perspective of Encino, general business operation of the customer was drilling wells. It's not managerial, administrative, tax preparation, and so on. It's the operation, drilling wells. Isn't that arguable? Not at all, Your Honor. And here's why. Because when you're producing the very product that the company sells, like if you're the factory line worker and you're the one producing that product, that's not general business operations and it's not management. And that's the problem here. There's actually two problems here. Management does not appear in the terminology. Under 541.201? There are alternatives. It doesn't have to be both. It can be directly management or general business operation of customers. Right, Your Honor. And here, though, what defines general business operation is distinguished from producing the product. And like I said, the company here, Schlumberger STC, sells drilling a hole to a specific place. This guy is integral to getting the information to the guy who's driving the train to drill to a specific place. And so that's not the general business operation. That is the business of the company. That's the product that they're selling, and he's producing it. Right? They can't produce it without him. Now, if he gives them bad data, it can be catastrophic. Sure. Just like, as the regulations mentioned, if a cashier who is going around and has all the money and loses all the money, that can certainly be an impact on the company. Right? Here we're talking about oil wells. But the analogy, I think, is the same, which is, yeah, you don't look at necessarily the consequence to decide if it's production work versus general business operations. If that were the case, anything at the company, no matter what the people do, is general business operations. Well, not really, because when, I'm just thinking about drilling an oil well, which costs several million dollars at least. And if you put the well down wrong, just as if you put a water well down wrong in the Texas Hill Country, it can cost you hundreds of thousands of dollars to retrieve it, as we learned from a case recently. So I would think directional drilling for oil and gas is even more, has to be more expertly calibrated, which is why you hire engineers to do, at least half engineers, to do the calibrations. Your Honor, they didn't plead the professional exemption where that level of education is important. I'm well aware of these exemptions. We've had many cases on them. We call that HCE. Yep. Yep. I know that you have. So I said there were two reasons why I said general business operations was distinct from producing the product. The second thing is here, they're not advising the customer. They're not advising the driller who's in the company, man, or at least the MWD is not, right? He's giving him the report. He's not telling him what to do with it, kind of like if he gave him logging samples, or he doesn't read those for him. Somebody else reads those. He just gives them the samples. So they're not giving advice on this. All they do is make sure that their piece of data that they get, the couple pieces of data that they get, are accurate. Now, can there be ramifications beyond that? Sure, but they're not the ones who make these decisions about these things, and they just sort of, and now they're doing it remotely. I mean, they're not even doing it You could also liken them to radiologists, couldn't you? Because all they do is take pictures. The radiologist tech takes the pictures. The actual doctor who has the ability to read that and tell you what that means, that's a very different job, and that's not what these guys do. Okay. They can do it with, if they can do it without an engineering degree, and he does do it without it, he did do it without an engineering degree, then it's not an exempt position. Thank you, Your Honor. Thank you, counsel. Mr. Lombardi. Thank you, Your Honor. I'd like to address several points. First of all, I think Mr. Brazeal may have gone outside the record a bit in talking about directional drillers and some of the things they do in the relationship, and maybe on a few other points as well, but the record is what the record is. Judge Ho asked whether or not this was an issue of law or fact. There is an issue of fact in this case regarding discretion and judgment. Plaintiffs say they did not exercise it. Schlumberger's witnesses said that they did exercise it, but as far as the directly supporting the general operations of the business, every single fact I referenced was a fact that was contained in the judge's opinion, his finding the fact includes collusions of law, and also the testimony of the witnesses, and there was not a dispute of fact regarding that. The issue that we have with Judge Hegel's decision is when he did such things as saying that it must be of general application to the company and it has to be conceptual as opposed to functional, because those are clearly contrary to Encino and recent decisions interpreting the highly compensated exemption, and that is a pure issue of law. Mr. Brazeal also talked about the plaintiffs don't do anything besides hand it over. Again, that's not supported by the testimony. The plaintiffs admitted over and over again that they were responsible for ensuring the accuracy of the data. They're responsible for both surveys and the logs. The logs had to do with the gamma rays resistivities. There is no red and green for the logs. Their duty was to mask bad data and ensure that good data was passed along, and just playing the passing along of good data is an analytical function. Even if it doesn't reach judgment and discretion, it's an administrative analytical function that's crucial to the support of the well, because everyone admitted at trial that this is a crucial function. You cannot drill a well without the MWD supporting it, and if you attempt to do so, the results could be catastrophic. What about his analogy to the technician, the medical technician who takes images, whether they're x-rays or whatever, however they're generated, and ensures that they're readable and then passes them along to the radiologist? Your Honor, they do more than take the pictures. They analyze the data. They throw out the bad data. That's something that radiologists don't do. Also, Your Honor, I think that Xenakis is important in this respect, where they found that 99 inspectors did not qualify under the because they didn't also have to prove judgment and discretion. It's the nature of the basic function. Does it support the general operations? Clearly, gathering the data, analyzing it, QCing it, making sure that it's something that the client can actually use is crucial to the operations. As Judge Jones was talking about, there could be catastrophic results if the data is not correct. It goes to the two levels. It goes to their own quality control function, whether or not the data they are passing is accurate. It does take analysis. They had to look at it, and even if it was red or green, both plaintiffs said they are important at being there as the human in the loop. Just as Judge Jones was saying, if these people were not necessary, Schlumberger could save millions of dollars a year by just passing the raw data directly onto the client. No, these people are here for a reason. They are the human in the loop, deciding whether or not what the machine says makes sense. That's just for the surveys, for the logs, looking at overall trends, looking at potential other impacts on the readings, such as did it happen at the same time that there was extra weight on the bit, or that there were extra vibrations that may have caused an improper reading. They are having to make decisions, judgment decisions, in terms of was this really the actual reading, or was something else causing it such that we need to eliminate it? Thank you, Your Honors. Thank you, Counsel. Your case is under submission. We appreciate it. Thank you.